FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN 1 8 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

RAVON BAYLOR,

            Petitioner,

  v.

MALFI,

            Respondent.

No. CV 06-7748-SGL (AGR)

ORDER ADOPTING MAGISTRATE
JUDGE'S REPORT AND
RECOMMENDATION

    Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Petition, all the records and files herein, the Magistrate Judge's Report and Recommendation, and the objections to the Report and Recommendation that have been filed herein.  Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

    IT IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED:  1 - 16 - 08

                           STEPHEN G. LARSON
                UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                          CENTRAL DISTRICT OF CALIFORNIA
10
11    RAVON BAYLOR,                        )        NO. CV 06-7748-SGL (AGR)
12              Petitioner,                )
13                                         )
                   v.                      )
14                                         )        REPORT AND
      MALFI,                               )        RECOMMENDATION OF UNITED
15                                         )        STATES MAGISTRATE JUDGE
                Respondent.                )
16                                         )
17    _____ )

18          The Court submits this Report and Recommendation to the Honorable

19    Stephen G. Larson, United States District Judge, pursuant to 28 U.S.C. § 636

20    and General Order No. 05-07 of the United States District Court for the Central

21    District of California.  For the reasons set forth below, the Magistrate Judge

22    recommends the Petition for Writ of Habeas Corpus be denied.

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

# I.

## SUMMARY OF PROCEEDINGS

On November 4, 2003, a Los Angeles County Superior Court jury convicted Petitioner of first-degree murder and two counts of attempted murder plus enhancements. (Petition at 2; Answer at 1.) On January 14, 2004, Petitioner was sentenced to 100 years to life plus 10 years in prison. (*Id.*) On June 16, 2005, the California Court of Appeal affirmed Petitioner's conviction in an unpublished decision. (Lodged Document ("LD") 6.) On March 1, 2006, the California Supreme Court denied review. (LD 9.)

Pursuant to 28 U.S.C. § 2254, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court on December 6, 2006, in which he raised four grounds: (1) a Confrontation Clause violation, (2) a due process violation regarding an audiotape and transcript of that tape, (3) a due process violation regarding the admission of a witness's testimony, and (4) a due process violation regarding the prosecution's failure to secure the presence of a defense witness. (Petition at 5-6.)

Respondent filed an answer on February 27, 2007, admitting exhaustion and timeliness. (Answer at 2.) On April 9, 2007, the Court granted Petitioner's request for an extension of time to file a reply to April 23, 2007. On May 18, 2007, having received no reply, the Court issued an order granting Petitioner until June 15, 2007, to file a reply. On June 11, 2007, the Court granted Petitioner's request for another extension of time to file a reply to July 5, 2007. On July 12, 2007, the Court granted Petitioner's request for another extension of time to file a reply to August 6, 2007. On August 24, 2007, having still received no reply, the Court issued an order giving Petitioner until September 21, 2007, to file a reply, and advising him that "failure to file a Reply may result in the allegations of the Return being accepted as true pursuant to 28 U.S.C. § 2248." Petitioner has neither filed a reply nor requested another extension of time.

2

1    This matter was taken under submission and is now ready for decision.

2                                      II.

3                          **STATEMENT OF FACTS**

4    Below are the facts set forth in the California Court of Appeal decision on

5    direct review.  To the extent an evaluation of Petitioner's claims for relief depends

6    on an examination of the record, the Court has made an independent evaluation

7    of the record specific to Petitioner's claims for relief.

8    *The Gallegos Crimes*

9    Gallegos and his cousin Juan Ramirez drove to 115th Street in the

10   Nickerson Gardens housing projects on October 11, 2002, at

11   approximately 8:30 p.m., to meet their friend Tony Rodriguez.   Defendant

12   approached them and threatened, "Don't be coming around my hood," and

13   began to walk away.   Gallegos replied that he "just came to pick up a

14   friend."   Defendant turned around and walked to a nearby parking lot.

15   Gallegos picked up Rodriguez and drove around the corner to a nearby

16   residence to retrieve a hat for Rodriguez.

17   Defendant reappeared with codefendant Cedric Lamonte Sanchez, and

18   walked in front of Gallegos's car.   They walked past Gallegos and his

19   friends, staring at them angrily.   The initials "BH" were tattooed on

20   defendant's face.   Gallegos drove his friends toward the street corner.

21   Defendant and Sanchez walked up to the car from behind.   When

22   Gallegos turned around, he saw that Sanchez was pointing a handgun at

23   him.   Defendant pulled out his own gun and both of them began firing,

24   hitting Gallegos approximately eight times as he tried to drive away.   He

25   managed to drive a few blocks before his injuries overwhelmed him.

26   Ramirez took over and drove Gallegos to the hospital, where he stayed for

27   about three weeks, having suffered a broken left arm and right hand, a

28

                                       3

1   collapsed lung and cracked sternum-gunshot injuries that had not entirely
2   healed by the time of trial.
3   A search of the crime scene disclosed six .9-millimeter shell casings
4   scattered along the street.   Gallegos's car had numerous bullet holes on
5   the driver's side door and rear panel, as well as window damage.   Prior to
6   trial, but after having the six shell casings booked into evidence and
7   analyzed, the police destroyed the evidence.   Under police policies, such
8   materials generally are not destroyed until a case is over and they lose
9   their evidentiary value. Investigating Officer Christian Mrakich of the Los
10  Angeles Police Department did not authorize or find out about the
11  destruction until after it happened, because somebody "dropped the ball."
12  Los Angeles Police Department firearms examiner Starr Sachs found that
13  the six casings had been fired from the handgun later discovered in
14  defendant's apartment.
15  Officer Mrakich interviewed Gallegos while he was recuperating from his
16  gunshot injuries at home.   Gallegos identified defendant from a "six-pack"
17  photographic lineup as the person who shot him.   After the shooting, the
18  police had Gallegos move residences.   At trial, he testified while in fear of
19  his life.
20  Ramirez also identified defendant from the photo spread as the shooter.
21  He and his family were relocated from Nickerson Gardens after the
22  shooting, because he was afraid to live there.   Sanchez lived near
23  Nickerson Gardens at the time of the shooting.
24  Officer Victor Ross of the Los Angeles Police Department, an expert in
25  criminal street gangs, testified that defendant and Sanchez were active
26  members of the Bounty Hunter Bloods, which considered the Nickerson
27  Garden housing projects to be its "stronghold."   Members of the Bounty
28  Hunter Bloods committed various crimes, including murder and attempted

4

murder, for the gang's benefit.   The initials "BH" are a gang identifier. Typically, an unknown Hispanic in Bounty Hunter Bloods territory would be challenged by a gang member.   Terrorizing such Hispanics benefitted the Bounty Hunter Bloods.   Sanchez was known as defendant's crime partner.

### *The Hall/Landry Crimes*

On October 17, 2002, at approximately 4:30 p.m., Landry and Hall were walking to a liquor store near the corner of Imperial Highway and Avalon in Los Angeles, when defendant, who had a "BH" tattoo on his face, rode toward them on a bicycle and asked Landry, "Where are you from?"-meaning, are you a "gang banger?" Landry replied he was not.   He and Hall decided not to go to the store; the confrontation with defendant had frightened them.   They walked back toward Avalon, stopped at the light, and began to walk down Imperial.

Defendant rode to a nearby parking lot, circled around, rode back toward Landry and Hall, drew his handgun, and fired it at Landry, hitting him twice in the left arm, twice in the back, and three times in his buttocks and thigh (where one bullet remained).   When defendant began firing, Landry ran away across Imperial.   Hall was killed at the scene.   Sergeant Paul McKechnie of the Los Angeles Police Department responded and found Hall lying face down on the northwest corner of Avalon and Imperial Highway, with gunshot wounds to his chest.   Hall had suffered seven gunshot wounds;  three of which were fatal, piercing his kidney, heart, and aorta.

Landry spent two days in the hospital after the shooting.   At the time of the trial, his wounds still caused pain and limited his mobility.   While in the hospital, Detective Christopher Barling of the Los Angeles Police Department showed Landry a "six-pack" photographic lineup.   Landry

1  identified defendant's photograph, adding that if a small white dot covering
2  part of the subject's face was a tattoo, he would be 100 percent sure of his
3  identification.   In fact, the dot covered defendant's "BH" tattoo.   Landry
4  told the detective that the person he identified was the one "who shot at
5  him and his friend."
6  Detective Barling found a fired bullet, approximately 12 expended casings,
7  and a bullet fragment at the scene.   A search of defendant's Nickerson
8  Gardens apartment uncovered a loaded Beretta .9-millimeter handgun
9  hidden in an upstairs bedroom.   Firearms examiner Sachs found that the
10  casings and the expended bullet had been fired from the handgun
11  discovered in defendant's apartment.

12

13  ***Post-Arrest Activity***

14  While in custody after his arrest, the police monitored some of defendant's
15  communications for witness safety reasons.   In one such audiotaped
16  conversation with his girlfriend Tammy Calhoun, defendant gave her the
17  home address of Gallegos and asked her to telephone a person named
18  "Foxy," which was the gang moniker of a member of a subset of the Bounty
19  Hunter Bloods.   A search of Calhoun's residence after that conversation
20  disclosed jail visitation passes, along with a handwritten note containing
21  Foxy's name, telephone number, and the word "Mexican"-all consistent
22  with defendant's statements in the taped conversation.   In another
23  audiotaped conversation, defendant told Calhoun to do what she could to
24  help him locate the victims to prevent their testifying against him.   He also
25  talked about finding "bitches" to help him fashion an alibi.
26  Officer Mrakich overheard another jailhouse conversation in which
27  defendant told Michael Gordon to copy something down and to swallow it if
28  he got stopped by the authorities.   A search of the dresser drawer in

1   Gordon's residence disclosed a handwritten notation of Gallegos's home
2   address on a county jail printout of an inmate's housing location and
3   booking number.
4   In another audiotaped conversation with Calhoun, defendant told her that
5   someone "snitched" on him-that is, someone identified him as having
6   committed a crime.   To be labeled a "snitch" by a gang member would put
7   that person's safety in danger.   Concern for the safety of Landry, Gallegos,
8   and Ramirez led to an investigation and court approved wiretap.
9   Finally, in another audiotaped pretrial telephone conversation, this time
10   with a person called "Del Dog," defendant referred to efforts to prevent
11   Landry from testifying against him.   At one point, according to Officer
12   Mrakich and the transcript (which was not admitted into evidence),
13   defendant stated:  "The nigger that I killed from East Coast, nigger named
14   [Hall]." During the search of Calhoun's residence, the police found a piece
15   of paper with the handwritten notation, "Colden and Vermont," which was
16   the area where Landry lived.
17   (LD 6 at 3-7 (footnotes omitted).)

### III.

### <u>STANDARD OF REVIEW</u>

20      A federal court may not grant a petition for writ of habeas corpus by a
21   person in state custody with respect to any claim that was adjudicated on the
22   merits in state court unless it (1) "resulted in a decision that was contrary to, or
23   involved an unreasonable application of, clearly established Federal law, as
24   determined by the Supreme Court of the United States"; or (2) "resulted in a
25   decision that was based on an unreasonable determination of the facts in light of
26   the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);
27   *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)
28   (per curiam).

1  "'[C]learly established Federal law' . . . is the governing legal principle or

2  principles set forth by the Supreme Court at the time the state court rendered its

3  decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed.

4  2d 144 (2003).  A state court's decision is "contrary to" clearly established

5  Federal law if (1) it applies a rule that contradicts governing Supreme Court law;

6  or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision

7  of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3,

8  8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

9  Under the "unreasonable application prong" of section 2254(d)(1), a federal

10  court may grant habeas relief "based on the application of a governing legal

11  principle to a set of facts different from those of the case in which the principle

12  was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26

13  (state court decision "involves an unreasonable application" of clearly established

14  federal law if it identifies the correct governing Supreme Court law but

15  unreasonably applies the law to the facts).

16  A state court's decision "involves an unreasonable application of [Supreme

17  Court] precedent if the state court either unreasonably extends a legal principle . .

18  . to a new context where it should not apply, or unreasonably refuses to extend

19  that principle to a new context where it should apply." *Williams v. Taylor*, 529

20  U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

21  "In order for a federal court to find a state court's application of [Supreme

22  Court] precedent 'unreasonable,' the state court's decision must have been more

23  than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct.

24  2527, 156 L. Ed. 2d 471 (2003) (citation omitted).  "The state court's application

25  must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Clark

26  v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).

27  "[S]tate court factual findings are presumed correct in the absence of clear

28  and convincing evidence to the contrary." *Mitleider v. Hall*, 391 F.3d 1039, 1046

8

1  (9th Cir. 2004); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029,

2  154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed

3  correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a

4  decision adjudicated on the merits in a state court and based on a factual

5  determination will not be overturned on factual grounds unless objectively

6  unreasonable in light of the evidence presented in the state-court proceeding, §

7  2254(d)(2).").

8      In applying these standards, this Court looks to the last reasoned State

9  court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006).  To the

10  extent no such reasoned opinion exists, as when a state court rejected a claim in

11  an unreasoned order, this Court must conduct an independent review to

12  determine whether the decisions were contrary to, or involved an unreasonable

13  application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*,

14  223 F.3d 976, 982 (9th Cir. 2000).  If the state court declined to decide a federal

15  constitutional claim on the merits, this Court must consider that claim under a *de*

16  *novo* standard of review rather than the more deferential "independent review" of

17  unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391

18  F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim

19  state court did not reach on the merits).

20                                      **IV.**

21                                **DISCUSSION**

22      **A.    GROUND ONE: Confrontation Clause Violation**

23      In *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d

24  177 (2004), the Supreme Court held that under the Confrontation Clause of the

25  Sixth Amendment, testimonial, out-of-court statements are inadmissible in a

26  criminal proceeding unless the witness was unavailable to testify and the

27  defendant had a prior opportunity for cross-examination.  Only testimonial

28  statements are subject to exclusion under the Confrontation Clause.  "Where

nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* at 68; *see also Davis v. Washington*, 126 S. Ct. 2266, 2273, 165 L. Ed 2d 224 (2006) ("Only [testimonial] statements . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause"). Although *Crawford* declined "to spell out a comprehensive definition of 'testimonial,' . . . it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.  In *United States v. Larson*, 460 F.3d 1200 (9th Cir. 2006), the Ninth Circuit stated that "*Crawford* at least suggests that the determinative factor" in deciding whether a statement is "testimonial" "is the declarant's awareness or expectation that his or her statements may later be used at a trial." *Id.* at 1213 (footnote omitted) (quoting from *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004), *cert. denied*, 543 U.S. 1079 (2005)).

However, such error is harmless unless it had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  The factors in determining whether the error was harmless "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

Petitioner contends that (1) the California Court of Appeal was incorrect in its finding that he forfeited his rights under *Crawford* by failing to object at trial; (2) the Court of Appeal was incorrect in "its view that *Crawford* is more limiting than

10

1  *Ohio v. Roberts*"; and (3) the trial court erred in its ruling on the state hearsay

2  exception. (Petition at 5 Attachment Sheet.)

3       The California Court of Appeal decision was the last reasoned decision

4  under *Davis*. The court concluded that any claim of a Confrontation Clause

5  violation had been waived because it "must be timely asserted at trial or it is

6  waived on appeal." (LD 6 at 10.)  Respondent therefore argues that this ground

7  is procedurally barred. (Answer at 11.)  However, because the procedural bar

8  issue is more complex, the Court will proceed to the merits, which leads to the

9  same result. *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); *see also*

10 *Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771

11 (1997) (the merits may be resolved before a procedural bar issue if the

12 procedural bar "involved complicated issues of state law").  The Court of Appeal

13 also addressed the merits. (LD 6 at 13.)  Thus, Petitioner's first argument about

14 waiver is moot.

15      Petitioner's second argument appears to involve the following sentence in

16 the Court of Appeal's decision:  "[I]f the viability of a confrontation challenge was

17 poor under *Roberts*, it would have been even worse after *Crawford*." (LD 6 at

18 12.)  Petitioner does not explain how this "view" is incorrect or how his argument

19 is relevant to the merits of his claim. Petitioner objects to Detective Barling's

20 description of Landry's identification of Petitioner in a photo spread. (LD 2 at

21 150.)  Landry testified at trial, was subject to cross-examination and subject to

22 recall at the defense's request. (*Id.* at 95, 120-131, 133.)  "The [Confrontation]

23 Clause does not bar admission of a statement so long as the declarant is present

24 at trial to defend or explain it." *Crawford*, 541 U.S. at 59 n.9.  The California

25 Court of Appeal's decision was not contrary to, or an unreasonable application of,

26 clearly established federal law.

27      Petitioner's third and last argument, that the trial court erred in its

28 application of California's hearsay rule, fails as it is not cognizable here.  A claim

11

1    involving only the application and/or interpretation of California law is not

2    cognizable on federal habeas review.  *See* 28 U.S.C. § 2254(a);  *Bradshaw v.*

3    *Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 604, 163 L. Ed. 2d 407 (2005) (per

4    curiam) ("[A] state court's interpretation of state law, including one announced on

5    direct appeal of the challenged conviction, binds a federal court sitting in habeas

6    corpus."); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d

7    385 (1991) ("it is not the province of a federal habeas court to reexamine

8    state-court determinations on state-law questions"); *Smith v. Phillips*, 455 U.S.

9    209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("Federal courts hold no

10    supervisory authority over state judicial proceedings and may intervene only to

11    correct wrongs of constitutional dimension."); *Langford v. Day*, 110 F.3d 1380,

12    1389 (9th Cir. 1996) ("We accept a state court's interpretation of state law, . . .

13    and alleged errors in the application of state law are not cognizable in federal

14    habeas corpus."), *cert. denied*, 522 U.S. 881 (1997).

15        Petitioner's claim fails.

16    **B.    GROUND TWO:  Due Process - Tape and Transcript**

17        Respondent argues that this ground is procedurally barred.  (Answer at

18    14.)  However, because the procedural bar issue is more complex, the Court will

19    proceed to the merits, which leads to the same result. *Franklin v. Johnson*, 290

20    F.3d 1223, 1232 (9th Cir. 2002); *see also Lambrix v. Singletary*, 520 U.S. 518,

21    525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) (the merits may be resolved

22    before a procedural bar issue if the procedural bar "involved complicated issues

23    of state law").  The Court of Appeal's decision, which was the last reasoned

24    decision under *Davis*, also addressed the merits.  (LD 6 at 19.)

25        Petitioner contends his due process rights were violated when the court,

26    after admitting into evidence a taped phone call, permitted the jury to read a

27    transcript of the tape, even though the transcript was not admitted into evidence.

28    Petitioner does not explain in what way his due process rights were violated.  *See*

12

1   *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner may not

2   "transform a state-law issue into a federal one merely by asserting a violation of

3   due process"), *cert. denied*, 522 U.S. 881 (1997).  He simply says, "The tape was

4   placed into evidence but the jurors when examining that evidence had a clear

5   instruction as to its content and meaning being that in the transcripts."  Petitioner

6   appears to be arguing that the judge's admonition given regarding a tape and

7   transcript was erroneous.

8        "The only question . . . is 'whether [a jury] instruction by itself so infected

9   the entire trial that the resulting conviction violates due process."  *Estelle v.*

10  *McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting

11  *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).

12  "[I]t must be established not merely that the instruction is undesirable, erroneous,

13  or even 'universally condemned,' but that it violated some [constitutional right].'"

14  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431

15  (1974).  This standard requires that "the degree of prejudice resulting from

16  instruction error be evaluated in the total context of the events at trial."  *United*

17  *States v. Frady*, 456 U.S. 152, 169, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982).

18  "[W]e also bear in mind . . . that we 'have defined the category of infractions that

19  violate "fundamental fairness" very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting

20  *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708

21  (1990)).

22       Three audiotapes were identified and admitted into evidence.  (LD 2 at 544,

23  550, 555, 633, 634.)  The one at issue is the "Del Dog" tape.  (*Id.* at 555; LD 1 at

24  213-19 (transcript).)  When the "Del Dog" tape was introduced, the trial court told

25  the jury that "the same admonition will, of course, apply."  (LD 2 at 555.)  The

26  court was referring to its admonition given when the first tape and transcript were

27  identified:

28

1    COURT:  Ladies and gentlemen, in a moment, the prosecutor Mr.

2    Gallon is going to play this tape that's been marked as People's 47

3    for you.  Or just a portion of it.  What's been passed out to you is a

4    transcript prepared of that tape.  Now, the transcript may or may not

5    reflect what you hear on the tape.  The tape has been marked as

6    evidence and will probably be accepted into evidence, so that would

7    be a proper item for your consideration.  [¶]  The transcript is

8    provided for the sole purpose of assisting you in listening to the tape.

9    The reason is, based on my experience with these tapes is they're

10   typically not the greatest quality in the world, and sometimes it's hard

11   to hear some of the words that are used.  And also the language that

12   is used often times in tapes offered in court is hard to understand for

13   many people as well.  [¶]  So the tape is what you're listening to.  If

14   you hear something that you see written differently on the paper,

15   disregard what's on the tape.  Your responsibility is to listen to the

16   tape and make a factual determination from that tape.  [¶]  Again, the

17   transcript is there just to help you out in hearing and understanding.

18   I'll collect the transcript as soon as we've completed listening to the

19   tape.  You will not have the transcript in the jury room to listen to.  Or

20   excuse me – to look at.  However, if during the course of your

21   deliberations, you want to hear the tape again, you'll be able to do

22   that in the same circumstances that you hear it here in court.  In

23   other words, you'll come back into the court.  You'll sit in the jury box.

24   We'll play the tape for you, and you'll have the transcript to assist

25   you again.  But you won't have the transcript actually in the jury room

26   during the time that you're deliberating.

27   (LD 2 at 544-45.)

28

14

1     To the extent Petitioner's argument is that the judge's admonition was

2  incorrect because at one point he misspoke ("If you hear something that you see

3  written differently on the paper, disregard what's on the tape."), clearly, the judge

4  meant to say "disregard what's on the transcript."  Based on the context and the

5  surrounding explanation by the judge, no one on the jury could have failed to

6  understand what the judge meant.  She admonished the jury that only the tape

7  was admitted into evidence, that only the tape "would be a proper item for your

8  consideration," that the transcript was provided only to assist them in listening to

9  the tape, that they should "listen to the tape and make a factual determination

10  from that tape," that the transcript was "there just to help you out in hearing and

11  understanding." (*Id.* at 545.)  Moreover, Petitioner's counsel argued to the jury

12  that they should listen to the tape because the transcript was incorrect.  (LD 2 at

13  728-29.)  The California Court of Appeal's decision (LD 6 at 22-23) was not

14  contrary to, or an unreasonable application of, clearly established federal law and

15  was not an unreasonable determination of the facts.

16     Petitioner's claim fails.

17     **C.    GROUND THREE:  Inflammatory Testimony**

18     Whether evidence was "incorrectly admitted . . . pursuant to California law .

19  . . is no part of a federal court's habeas review of a state conviction." *Estelle v.*

20  *Mcguire*, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (internal

21  quotation marks omitted) (first ellipses in original).  The only issue is whether the

22  admission violated Petitioner's "federal constitutional rights." *Id.* at 68; *see also*

23  *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  Thus, the key

24  question is whether "the trial court committed an error which rendered the trial so

25  arbitrary and fundamentally unfair that it violated federal due process." *Id.* at 920

26  (internal quotation marks omitted).

27     Petitioner argues that some of the testimony of victim Gallegos was

28  "inflammatory, prejudicial speculation involving casting the defendant as an AI

15

1  Capone like mob leader ordering death from his jail cell." (Petition at 5

2  Attachment Sheet.)  Respondent also argues that this ground is procedurally

3  barred. (Answer at 11.)  However, because the procedural bar issue is more

4  complex, the Court will proceed to the merits, which leads to the same result.

5  *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); *see also Lambrix v.*

6  *Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) (the

7  merits may be resolved before a procedural bar issue if the procedural bar

8  "involved complicated issues of state law").  The Court of Appeal's decision,

9  which was the last reasoned decision under *Davis*, also addressed the merits.

10  (LD 6 at 25.)

11    Gallegos testified that he and his cousin Juan Ramirez drove to the

12  Nickerson Gardens housing project on the night of October 11, 2002, to pick up a

13  friend named Tony Rodriguez. (LD 2 at 326-29.)  When they arrived, Petitioner

14  approached them and said "Don't be coming around my hood." (*Id.* at 331.)

15  Gallegos replied, "I just came to pick up a friend." (*Id.*)

16    Rodriguez came out of his place, and the three drove around the corner.

17  (*Id.*)  Petitioner approached them again, this time accompanied by a shorter male.

18  (*Id.* at 333.)  The shorter male pointed a gun at Gallegos. (*Id.* at 342.)  Petitioner

19  also took out a gun, and both Petitioner and the shorter male began firing. (*Id.* at

20  343.)  Gallegos was hit about eight times. (*Id.*)  Gallegos drove about 3-4 blocks

21  until he couldn't drive any further, and Ramirez drove him to the hospital, where

22  Gallegos remained for about three weeks. (*Id.* at 343-44.)  Gallegos suffered a

23  broken left hand, a broken left arm, a  broken right hand, a collapsed lung, and a

24  cracked sternum. (*Id.* at 344.)  In addition to his identification of Petitioner at trial,

25  Gallegos testified that he identified Petitioner from photographs. (*Id.* at 347.)

26    Although Petitioner fails to cite to the record, Petitioner appears to

27  challenge the following testimony at the end of Gallegos's direct examination:

28

1    Q:  Sir, on the date this – or at around the time that you were shot, what

2         address were you and your family living at?

3    A:  At 1966 East 81st Street.

4    * * *

5    Q:  You do not live there anymore; correct?

6    A:  Correct, no.

7    Q:  And being here testifying are you in fear of your life?

8    A:  Yes.

9    Q:  And, in fact, during the course of this – between the time you were shot

10        and now, were you and your family relocated to a different location?

11   A:  Yes.

12   Q:  By the police?

13   A:  Yes.

14   (*Id.* at 371-72.)

15        The Court of Appeal found there was "no reasonable possibility that the

16   jury" would infer that any "evidence of defendant's attempt to eliminate Gallegos

17   after the crime as evidence that defendant harbored an intent to kill at the time of

18   the crime itself." (LD 6 at 25.) "[T]here was no reasonable possibility that the jury

19   would consider the evidence for anything other than Gallegos's credibility and

20   defendant's consciousness of guilt." (*Id.* at 26-27.) Under California law, "not

21   only the witness's fear, but an explanation therefore, is relevant to . . . credibility

22   and is well within the discretion of the trial court.'" (*Id.* at 27 (citation and internal

23   quotation marks omitted)); *see also United States v. Santiago*, 46 F.3d 885, 890

24   (9th Cir. 1995) (testimony of fear of retaliation is admissible "on the issue of

25   credibility").

26        Petitioner has offered no evidence to show that "the trial court committed

27   an error which rendered the trial so arbitrary and fundamentally unfair that it

28   violated federal due process." *Jammal*, 926 F.2d at 920 (internal quotation marks

17

omitted).  Petitioner offers no support that the trial court committed any error whatsoever.

Petitioner's argument is attenuated at best.  The testimony he complains about was brief.  Nor did Gallegos engage in any "speculation," as Petitioner claims.  (Petition at 5 Attachment Sheet.)  Gallegos's testimony about the change of residence of him and his family was simply that it happened and that he was testifying at trial despite fear for his life.  Neither of those statements is speculative.

Petitioner's claim fails.

## D.    GROUND FOUR: <u>Failure to Secure Defense Witness</u>

On January 6, 2004, the defense filed a motion for a new trial.  (LD 1 at 312.)  According to the motion, Bruce Lemon was a witness to the getaway of the shooter in counts 1 and 2.[1]  (*Id.* at 314.)  Lemon gave the police a detailed description of the shooter, but it did not include the tattoo on Petitioner's face.  (*Id.*)  Lemon was subpoenaed for trial as a defense witness but failed to appear.  (*Id.*)  A "body attachment" (bench warrant) was issued to arrest Lemon, but the sheriffs never picked Lemon up.  (*Id.* at 314-15.)  The defense moved for a new trial so Lemon could testify.  (*Id.* at 315.)  The trial court denied the motion.  (LD 2 at 762.)

Respondent argues that Ground Four does not state a federal question other than the use of the phrase "due process."  (Answer at 33.)  Petitioner does not state a violation of the Compulsory Process Clause[2] or a violation of *Brady v.*

---

[1]  Count 1 was the murder of Hall, and Count 2 was the attempted murder of Landry.  (LD 1 at 125-26.)

[2]  "[T]he Compulsory Process Clause guarantees a criminal defendant the right to present relevant and material witnesses in his defense." *Alcala v. Woodford*, 334 F.3d 862, 879 (9th Cir. 2003) (citations omitted); *see Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). "[T]he Government is under no obligation to look for a defendant's witnesses, in the absence of a showing that such witnesses were made unavailable through the suggestion, procurement, or negligence of the Government." *United States v.*

1    *Maryland*,[3] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  Nor did he do

2    so in California.  (LD 6 at 29 n.16.)  Petitioner has not explained how his due

3    process rights were violated.  (Petition at 6 Attachment Sheet.)  He cites to no

4    legal authority that the police's alleged failure to arrest a witness is a violation of

5    due process.

6        The California Court of Appeal, whose decision is the last reasoned one

7    under *Davis*, found "nothing in the record to support" the claim that the police "did

8    not even try" to secure Lemon's presence; the court labeled the claim "rank

9    speculation."[4]  (LD 6 at 31.)  The defense had no information as to Lemon's

10   whereabouts.  (*Id*.)  "Factual determinations by state courts are presumed correct

11   absent clear and convincing evidence to the contrary, § 2254(e)(1), and a

12   decision adjudicated on the merits in a state court and based on a factual

13   determination will not be overturned on factual grounds unless objectively

14   unreasonable in light of the evidence presented in the state-court proceeding, §

15   2254(d)(2)."  *Miller-El*, 537 U.S. at 340.  Petitioner offers no evidence, let alone

16   "clear and convincing evidence," to support his contention that the police "made

17   no effort to execute the body attachment."  (*Id*.)

18        Petitioner's claim fails.

19

20

21

_____

22
23   *Ballesteros-Acuna*, 527 F.2d 928, 930 (9th Cir. 1975) (citation and internal
      quotation marks omitted).

24
25      [3] Under *Brady*, the prosecution is obligated to turn over any evidence in its
      possession that is both favorable to the accused and material to the issue of guilt
      or punishment.  As the state court explained, the prosecution has no duty to look
      for exculpatory evidence.  (LD 6 at 31-32.)

26
27      [4] Petitioner continues his speculation in this petition: "Perhaps Lemon
      couldn't be located, but we will never know for certain what the influences and
28    resources of the state would have produced.  Nor will we know for certain
      whether the jury would have found his testimony sufficient to undermine the
      prosecution's case."  (Petition at 6 Attachment Sheet.)

# V.

## **RECOMMENDATION**

For the reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Report and Recommendation; and (2) denying the petition with prejudice.

DATED: November __, 2007

_____
ALICIA G. ROSENBERG
United States Magistrate Judge

1

## NOTICE

2    Reports and Recommendations are not appealable to the Court of Appeals,

3    but are subject to the right of any party to file Objections as provided in the Local

4    Rules Governing Duties of Magistrate Judges, and review by the District Judge

5    whose initials appear in the docket number.  No Notice of Appeal pursuant to the

6    Federal Rules of Appellate Procedure should be filed until entry of the Judgment

7    of the District Court.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28